JAMES B. THOMAS, as Treasurer of the WILLARD ASYLUM FOR THE INSANE, Respondent, *v.* THE BOARD OF SUPERVISORS OF WESTCHESTER COUNTY, Appellant.

At the request of plaintiff to " remit, by draft with exchange on New York," the amount of a conceded indebtedness on the part of the county of W., the treasurer of said county, instead of remitting in the manner requested, forwarded his check, drawn on M. & Co., of Mount Vernon, N. Y., and received back a receipt for the amount thereof. The check was sent immediately to the F. N. Bank of New York for collection; on the day of its receipt it was transmitted by mail to the drawees for collection and remittance, in accordance with a custom common among bankers. M. & Co. on the same day became insolvent; they returned to said bank, by mail, a draft drawn on the N. C. Bank of New York, which was received about the same hour the next day that a general assignment for the benefit of

creditors, made by M. & Co., was recorded.  It was the usual custom to remit in this manner.  Payment of the draft was duly demanded and refused.  It was immediately tendered back to M. & Co., and the return of the check demanded, which was refused, although it was still in their possession; it was then, on the same day, formally protested.  The check was afterwards returned, by M. & Co., to the treasurer of the county of W.  Thereafter the said treasurer was drawn upon for the same indebtedness ; payment was refused, the draft duly protested, and this action brought to recover the amount thereof ; the defendant, in its answer, alleged payment.  The trial court found that the F. N. Bank never agreed to accept the draft drawn by M. & Co. as payment, and, had the facts been known, would not have accepted it at all.  *Held,* that the finding was justified ; that the check drawn upon M. & Co., the receipt returned therefor, and the draft drawn by them did not, as between the parties hereto, constitute a payment of the indebtedness ; that the failure to collect the check was without the fault of the plaintiff or its agents ; that there was either a mutual mistake of fact or a fraud upon the part of M. & Co., either of which would prevent the receipt of the said draft from operating as payment.

The custom of debtor banks of sending drafts as a means of transferring money does not imply that such drafts are accepted absolutely as payment.  In such cases, and in the absence of a proved intention or agreement, their acceptance is *sub modo* only, and upon condition that when presented with due diligence they will be paid.

Also, *held,* the objection that plaintiff should have proceeded by *mandamus,* rather than by action, was not tenable, as the statute (Chap. 446, Laws 1874, tit. 3, § 17 ; tit. 4, § 4, as amended by chap. 574, Laws 1875, § 11) expressly authorizes an action in behalf of the plaintiff ; and, assuming that the remedy by *mandamus* applies to a case like the present, as to which *quære,* the two provisions can stand together as furnishing a double remedy for the same default.

*People ex rel.* v. *Cromwell* (102 N. Y. 477) distinguished.

(Submitted April 26, 1889 ; decided June 4, 1889.)

Appeal from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made on the first Tuesday of June, 1887, which affirmed a judgment in favor of plaintiff, entered upon a decision of the court on trial at Special Term.

This action was brought to recover an indebtedness of the county of Westchester to the Willard Asylum for the Insane. The answer alleged payment.

The material facts are stated in the opinion.

*Close & Robertson* for appellant. The only remedy of plaintiff, if its claim has not been paid, was to apply to the court for a writ of *mandamus* to compel the board of supervisors to audit its claim and cause the same to be made of the property of the county by the assessment and collection of a tax therefor. (R. S. [7th ed.] 979, § 4; *People ex rel. Johnston* v. *Bd. of Suprs.*, 45 N. Y. 196; *In re Tinsley*, 90 id. 231; *Huff* v. *Knapp*, 5 id. 65; *People* v. *Hans*, 21 How. 182; *Boyce* v. *Suprs.*, 20 Barb. 204; *Brady* v. *Suprs.*, 2 Sandf. 471; Laws of 1875, chap. 574; *Weston* v. *City of Charleston*, 2 Pet. 446; *Holmes* v. *Jennison*, 14 id. 564; *People* v. *Green*, 56 N. Y. 470; Maxwell on Int. of Stat. [2d ed.] 186–198; *Taylor* v. *Mayor, etc.*, 82 N. Y. 22.) The claims set forth in the complaint were paid by the defendant before action. (*People ex rel.* v. *Cromwell*, 102 N. Y. 477; *People* v. *M. and M. Bk.*, 78 id. 269.)

*Charles A. Hawley* for respondent. The form of the action is authorized by the statute organizing the Willard Asylum; and the remedy is by action, and not by *mandamus*. (Laws of 1874, chap. 446, title 3, § 17; title 4, §§ 2, 4, 6.) A proceeding by *mandamus* is not an action, because it is not commenced by the service of a summons (Code, § 416); but is a "special proceeding instituted by state writ." (Code Civ. Pro. chap. 16, title 2; Code, §§ 3333, 3339.) It may well be doubted whether the claim in suit is a "county charge" within the meaning of those words in the Revised Statutes; and whether there would be any mode of collection by the asylum had one not been given in the asylum statute. (1 R. S. 86, § 4; 361, § 2; 385, § 3; *McClure* v. *Suprs.*, 50 Barb. 596; Laws of 1855, chap. 428; 3 R. S. [5th ed.] 874; *Wolf* v. *Bd. of Suprs.*, 19 How. 70; *Moody* v. *Bd. of Suprs.*, 40 Barb. 659; 27 How. 343; 28 id. 353; 31 N. Y. 164; 36 Barb. 526; 47 id. 451.) If this were not so, the objection not having been taken, either by demurrer or answer, is deemed to have been waived, for the court certainly has jurisdiction and the complaint

states a cause of action. (Code of Civ. Pro. § 499.) The check of the county treasurer was presented with due diligence and according to usage. (*Smith* v. *Janes,* 20 Wend. 192; *Conroy* v. *Watson,* 3 J. Cas. 258; *Middletown Bk.* v. *Morris,* 28 Barb. 616; *Indig* v. *Nat. City Bk.,* 80 N. Y. 104; *Shipsey* v. *Bowery Nat. Bk.,* 59 id. 491; *In re Chemical Nat. Bk.,* 78 id. 269; *Merritt* v. *Todd,* 23 id. 41; *Smith* v. *Miller,* 6 Robt. 157; 43 N. Y. 171.) The check of the county treasurer was not payment of the debt of the county for it was not so agreed; nor was the sending by Masterton & Co. of their check on New York payment of the county treasurer's check. (13 N. Y. 167; 9 J. R. 310; 1 Cow. 384; 57 N. Y. 641; 3 Lans. 29; 38 N. Y. 289.) Masterton & Co. having failed before their check was received, no diligence was required in its presentation. The want of diligence is effective for a defense only when by it loss has occurred. (*Lovet* v. *Cornwell,* 6 Wend. 370; *Little* v. *Phœnix Bk.,* 2 Hill, 428; 7 id. 359; *Conroy* v. *Watson,* 3 J. Cas. 258, 264; *Murray* v. *Judah,* 6 Cow. 484; *Harbuck* v. *Croft,* 4 Duer, 122; *S. B. & N. Y. R. R. Co.* v. *Collins,* 3 Lans. 29; 57 N. Y. 641.) The action lies on the pre-existing debt. (*Bradford* v. *Fox,* 38 N. Y. 289; *S. B. & N. Y. R. R. Co.* v. *Collins,* 3 Lans. 29; 57 N. Y. 641.) To demand the return of the county treasurer's check was proper. (*Smith* v. *Miller,* 52 N. Y. 545.)

Finch, J. The indebtedness of the county of Westchester to the Willard Asylum is not disputed, but the controversy arises over the defense of payment. On October 1, 1884, the treasurer of the asylum sent a bill to the county requesting that its amount be remitted by draft with exchange on New York. Instead of so doing, the county treasurer returned his check as such, dated October thirty-first, drawn upon J. M. Masterton & Co., bankers, at Mount Vernon, N. Y. The check was received by the asylum on November third. On that day, and on the assumption that the check would be paid, the treasurer of the asylum sent a receipt for the amount of the

indebtedness.    The check did not thereby become payment. (*Burkhalter* v. *Second National Bank of Erie*, 42 N. Y. 538.)    The defendant does not claim the contrary, but rests its defense upon what afterward occurred.    Immediately upon the receipt of the check, and on the day of its receipt, the treasurer of the asylum sent it by mail to the First National Bank of New York for collection.    November fourth was election day, and the bank received the check November fifth, and on the same day sent it by mail to the drawees for collection and remittance.    This appears to have been done in accordance with a custom quite common among bankers, and not at all unusual.    It is shown that the custom, also, is for the drawee to remit by draft, and it must be assumed that the collecting agent expected that the remittance would be made in that manner, and through the means and intervention of a draft.    Such a draft the drawees sent.    It was dated November sixth, and drawn on the National Citizens' Bank of New York.    It was not mailed, however, until November seventh, and on that day Masterton & Co. failed and made a general assignment for the benefit of creditors, which was dated and acknowledged that day and recorded the next morning at 9.30 o'clock, and before the draft was received, or about the hour of its receipt, by the collecting agent, which was at the opening of business on that day.    The draft was worthless when received, and would not have been accepted at all had the facts been known.    While it was on its way the drawees were busy with the action which made it waste paper, and were withdrawing the fund upon which it purported to have been drawn. They must have known when they mailed it that the crash was at hand, that the draft was unavailing, and their possession of the check not perfected or justified by any payment.    The First National Bank presented the draft on the day of its receipt to the National Citizens' Bank, and demanded payment, which was refused, and thereupon, and still on the same day, a messenger was sent to Masterton & Co., who tendered back the draft and demanded the check, which was refused, although it was still in their possession and was not returned    the

county treasurer until some days later. The draft was formally protested on November eighth.

On this state of facts the appellant contends that the draft of Masterton & Co. operated as payment of the debt as between the present parties; and when met by the finding of fact that there was no agreement, understanding or intention that the draft should be taken as payment, answers by assailing that finding, and by a special reliance upon the decision of this court in the case of *People* v. *Cromwell* (102 N. Y. 477). A comparison of the two cases will disclose vital points of difference although the controversy in the case cited arose, as in this, from the failure of Masterton & Co. In that case the relator held certain bonds of the county of Westchester, interest coupons upon which had matured. Notice had been given that they would be paid by Masterton & Co. He presented them at their counter. They had on hand the means of payment furnished by the county, and could and would have paid the coupons in cash but for what further transpired. The relator was offered his choice of the money or a draft, and chose to accept a draft which was given him. This was on the sixth of November. If it had been presented that day or the next, it might and probably would have been paid. The court said that the relator had not removed the imputation of laches. Here no laches either existed or is pretended. Due diligence was used all along the line, and the failure to collect was shown to be without fault of the plaintiff or its agent. In the cited case it is observed that Masterton & Co. were not liable upon the coupons and in no manner connected with the obligation to be paid, and so their sole authority was to make payment. Here the original liability was represented by a check to which Masterton & Co. had been made parties, and upon their agency to pay was superinduced a liability as drawees, which they could only discharge by their own payment in default of which it would continue. But beyond both of these differences which seem to us important and vital, there is disclosed another which is decisive. Upon the facts in the case cited it was impossible to deny that the draft was delivered and accepted

as payment, without either mutual mistake of fact or fraud
on the part of the paying agent.    The relator was offered his
choice between the money and a draft and chose the latter,
and surrendered his coupons as paid.    He could have taken
the cash, and was not at liberty to refuse it when offered, and
take in its stead the liability of Masterton & Co. without sub-
jecting himself conclusively to the inference that he volun-
tarily and of his free choice took their draft as payment.
Here the facts point to the contrary inference.    The collect-
ing bank was offered no choice and refused no payment
in money.    Its request was to remit, and undoubtedly it
expected a draft, but never agreed to accept it as payment.
The  custom  proved  does  not  reach  to  that  result.
It was merely for the debtor bank to send a draft as a
means of transferring the money.    It was not that such drafts
are accepted absolutely as payment.    Neither from custom,
therefore, nor from any express agreement, was the draft
accepted as payment, or otherwise than as an expected means
of obtaining payment.    And no such intention or agreement
can be implied.    The collecting bank did not part with the
check on the faith of the draft.    It parted with it on the
faith and in the expectation of payment, to be made undoubt-
edly through the medium of a draft, but a draft that would
produce the money and be in truth its equivalent.    In such a
case, and in the absence of a proved intention or agreement, the
acceptance of the draft is *sub modo* only, and upon the condition
that when presented with due diligence it will be paid.    But
beyond that the fact here is that there was either a mutual
mistake of fact, which would prevent the receipt of the draft
from operating as payment, or fraud on the part of Masterton
& Co.    If, when they mailed the draft on the morning of the
seventh, they knew, as it is reasonably certain they must have
known, that it was bad and would be worthless on its arrival,
and proceeded at once to make it worthless, their draft,
instead of payment, was a fraud from which they could gain
no advantage and through which the drawers could obtain

none.    No refinement of reasoning can convert such a fraud into payment, either as to the drawees or the drawer.

If, on the other hand, the improbable supposition is indulged that Masterton & Co., when they mailed the draft on the seventh, honestly thought it good and themselves able to continue business, then they were honestly mistaken, and the draft was sent and received under a mutual mistake as to existing facts.    The case of *Roberts* v. *Fisher* (43 N. Y. 159) was one in which the note of a third person was delivered by a debtor to his creditor in payment for goods purchased, and which the latter received in payment and discharge of the debt. The maker of the note was insolvent when the transfer was made, though the fact was unknown to the contracting parties. The question raised was which of them should bear the loss. The court said : "Upon broad principles of justice, it would seem that a man should not be allowed to pay a debt with worthless paper, though both parties supposed it to be good ; " and added that the loss had already occurred when the note was received.    The loss had actually fallen upon and happened to the vendee before the note was received by the vendor, and the vendee could not shift his own loss upon the vendor, both parties acting innocently, as payment for the goods bought. So here.    Before the draft was received, and while it was on its way, the county of Westchester had lost its money on deposit with Masterton & Co. by the failure of that firm. Its check was unpaid and its liability remained, and even if the collecting bank could be said to have accepted the draft, it did so under a mutual mistake of fact, if Masterton & Co. were innocent in sending it, and had not, as in the *People* v. *Cromwell*, taken all risks of the paper by a new dealing put in the place of and intended to take the place of the money actually tendered. We think, therefore, the decision below was so far correct. Nor is that conclusion averted by the objection taken that the plaintiff should have proceeded by *mandamus* directed to the board of supervisors, rather than by action, because the statute conferring the latter right, by its terms, was intended not to change the remedy, but dictate in whose name it might be

enforced.   The construction claimed is very narrow and some-
what artificial, but defended mainly upon the ground that
otherwise the statute providing for the presentation of claims
to the supervisors and their audit thereof would be partially
repealed by implication.   We expressed a doubt in *People* v.
*Cromwell* whether the remedy by *mandamus* applied at all to a
case like the present; but, assuming that it does, it only follows
that an additional remedy by action has been given.   The two
provisions can stand together as furnishing a double remedy
for the same default.   The statute relating to the asylum
expressly authorizes an action by its treasurer, and a study of
its origin leaves no doubt of its meaning and intention.   The
bills of the asylum are payable monthly out of a necessary
regard for its maintenance, and it was clearly not intended to
leave it without remedy until the meeting of the supervisors
and subject it to their audit.

We find no error in the judgment, and it should be affirmed,
with costs.

All concur.

Judgment affirmed.